Ryan P. Steen, AK Bar No. 0912084
Jason T. Morgan, AK Bar No. 1602010
Stoel Rives LLP
600 University Street, Suite 3600
Seattle, Washington 98101
(206) 624-0900 (phone)
(206) 386-7500 (facsimile)

Connor R. Smith, AK Bar No. 1905046
Stoel Rives LLP
510 L Street, Suite 500
Anchorage, Alaska 99501
(907) 277-1900 (phone)
(907) 277-1920 (facsimile)

*Attorneys for United Cook Inlet Drift Association and
Cook Inlet Fishermen's Fund*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

|  |  |
|---|---|
| UNITED COOK INLET DRIFT ASSOCIATION and COOK INLET FISHERMEN'S FUND,<br><br>        Plaintiffs,<br><br>v.<br><br>NATIONAL MARINE FISHERIES SERVICE; NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION; GINA RAIMONDO, in her official capacity as the United States Secretary of Commerce; JANET COIT, in her official capacity as Assistant Administrator, National Oceanic and Atmospheric Administration; and JON KURLAND, in his official capacity as NMFS Alaska Region Administrator,<br><br>        Defendants. | Civil Action No.: 3:24-cv-00154<br><br>**COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF, AND PETITION FOR REVIEW (42 U.S.C. § 4332; 16 U.S.C. §§ 1801-1891d; 5 U.S.C. §§ 553, 701-706)** |

*United Cook Inlet Drift Association, et al. v. NMFS, et al.*
Case No. 3:24-cv-00154

1

## INTRODUCTION

1.      Plaintiffs have two related actions pending in *United Cook Inlet Drift Association, et al., v. National Marine Fisheries Service, et. al.*, No. 3:21-cv-00255-SLG ("2021 Case") and *United Cook Inlet Draft Association, et al. v. National Marine Fisheries Service, et. al*, No. 3:24-cv-00116-SLG ("2024 Case"). Pursuant to Federal Rule of Civil Procedure 42, Plaintiffs respectfully request that this Court consolidate this action with Plaintiffs' pending cases because the actions involve common questions of law and fact.

2.      This and the 2024 Case are the most recent chapter in a more-than-a-decade-long attempt by Plaintiffs to get Federal Defendants to stop shirking their duty to prepare a lawful Fishery Management Plan ("FMP") amendment for the Cook Inlet salmon fishery. Although Plaintiffs have repeatedly prevailed—including before the Ninth Circuit and in the 2021 Case that challenged Amendment 14—Federal Defendants have continued to ignore their statutory duties in favor of deferring to the State of Alaska.

3.      The focus of the 2024 Case is Amendment 16 and its implementing regulations, which—like its predecessors Amendments 12 and 14—are arbitrary, capricious, and contrary to the Magnuson-Stevens Fishery Conservation and Management Act (the "MSA" or "Magnuson-Stevens Act"), 16 U.S.C. §§ 1801-1891d; the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, *et seq.*; and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551-559, 701-706.  Through Amendment 16, the National Marine Fisheries Service ("NMFS") has, once again, found

another way to try and continue to defer to Alaska's historic management practices, even as commercial harvests continue to dwindle. The 2024 Case seeks vacatur of the decision approving Amendment 16 and its implementing regulations. It also seeks an order requiring NMFS to comply with the MSA and develop an appropriate FMP that covers the "fishery."

4.      Pursuant to its unlawful FMP amendment—Amendment 16, NMFS issued a final rule announcing, "the final 2024 harvest specifications for the salmon fishery of the Cook Inlet exclusive economic zone (EEZ) Area" (the "Final Rule"). 89 Fed. Reg. 51448, 51448 (June 18, 2024). This complaint challenges NMFS's action taken through that Final Rule. For numerous reasons, many of which overlap with the claims in the 2024 Case, the Final Rule is arbitrary, capricious, and contrary to the Magnuson-Stevens Act, NEPA, and the APA.

5.      For the reasons discussed below, Plaintiffs respectfully request that this Court vacate the decision approving the Final Rule and its harvest specifications. Plaintiffs seek an order requiring NMFS to comply with the MSA and develop harvest specifications that flow from an appropriate FMP that covers the "fishery." Plaintiffs ask that the Court declare the Final Rule is arbitrary, capricious, and an abuse of discretion; not in accordance with law; and in excess of statutory jurisdiction, authority, or limitations. Plaintiffs seek an order vacating the Final Rule and remanding to Defendants under the prescriptive supervision of this Court as set forth in the Request for Relief below.

*United Cook Inlet Drift Association, et al. v. NMFS, et al.*
Case No. 3:24-cv-00154

3

## PARTIES

### Plaintiffs

6.     Plaintiff United Cook Inlet Drift Association ("UCIDA") is a corporation in good standing registered under the laws of the State of Alaska.  UCIDA represents the economic, social, and political interests of drift gillnet fishermen and their families in Cook Inlet, Alaska.  UCIDA currently has approximately 200 members who hold limited-access salmon driftnet fishing permits, issued by the State of Alaska, in Cook Inlet.  UCIDA membership ranges across 27 different states and one foreign country.

7.     UCIDA's members make their living by commercial fishing.  UCIDA's members hold State of Alaska limited-entry permits (meaning additional permits can no longer be issued and are fully allocated), which authorize them to catch all five species of salmon: sockeye, coho, chinook, chum, and pink.

8.     Drift gillnet boats are small-scale fishing operations, typically crewed by one to three persons.  Each fishing operation represents a substantial investment in the boat, gear, and the permit itself.  Each boat is generally allowed to deploy a single 900-foot-long gillnet.  The gillnet is suspended in the water column by floats (called "corks") as the boat drifts with the current—hence the name "drift gillnet."  After the gillnet is allowed to "soak" in the water for a length of time (as the boat and net drift with the current), the gear is hauled in, and the fish are removed and placed on ice in the boat's hold.  Those fish are then transported to, and offloaded at, one of Cook Inlet's local seafood processors in fishing communities such as Kenai, Kasilof, Ninilchik, or Homer.

After processing, these salmon are delivered throughout the United States and around the world.

9.     In addition to permit holders, UCIDA has approximately 30 associate members, including fish processors, gear suppliers, crew members, and other interested members of the community.

10.    UCIDA's mission is to promote public policy that facilitates the science-based and orderly harvest of Cook Inlet salmon in a manner that is economically and ecologically sustainable and that protects commercial salmon fishing in Cook Inlet as a viable way of life.  UCIDA and its members are committed to the protection of the environment of Cook Inlet, and to ensuring that its marine resources are both managed and conserved to enhance the health and productivity of the ecosystem.  To that end, UCIDA has advocated in state and federal forums for management of these salmon stocks in a manner consistent with the goals and objectives of the MSA, including management consistent with the MSA's Maximum Sustainable Yield ("MSY") principles (MSY is defined at 50 C.F.R. § 600.310(e)(1)(i)(A) as the largest long-term average catch or yield that can be taken from a stock or stock complex under prevailing ecological, environmental conditions).  The relief UCIDA seeks in this lawsuit is germane to its organizational purpose.

11.    Plaintiff Cook Inlet Fishermen's Fund ("CIFF") is a non-profit corporation registered under the laws of the State of Alaska.  CIFF has 446 members, including commercial fishermen of all gear types, seafood processors, and community members.

The majority of CIFF's members are from Alaska, but CIFF also has members from 21 other states.

12. CIFF's mission is to advocate on behalf of all commercial fishermen of Cook Inlet and for the coastal community more generally. CIFF's members and volunteers are fueled by the desire to save the commercial fishing industry in Cook Inlet as well as all of Alaska. The relief CIFF seeks in this case is germane to its organizational purpose.

13. UCIDA and CIFF (collectively, "Plaintiffs"), directly or through their members, fully participated, to the limited extent allowed by NMFS and the North Pacific Fishery Management Council, in the proceedings predating the decisions challenged in this lawsuit. Plaintiffs submitted detailed written comments and testimony on Amendment 16 and its implementing regulations and the accompanying draft environmental assessment ("EA"). Plaintiffs also submitted detailed written comments in the process leading up to the proposed rule, *see* 89 Fed. Reg. 25857, 25857–61 (May 12, 2024), and on the proposed rule. *See id.*

14. Plaintiffs have standing to bring this action because their members are directly and adversely impacted by the Final Rule implementing the harvest specifications, which improperly defers to the State of Alaska. Plaintiffs and their members are also adversely impacted by Defendants' failure to comply with the requirements of NEPA and the MSA. The challenged agency decisions are final and ripe for review by this Court.

**Defendants**

15.     NMFS is an agency of the National Oceanographic and Atmospheric Administration ("NOAA"), U.S. Department of Commerce.  NMFS is sometimes referred to as "NOAA Fisheries."  Among its duties, NMFS is responsible for managing commercial marine fisheries to ensure sustainable harvests that provide the greatest overall benefit to the nation pursuant to the MSA.

16.     Defendant Gina Raimondo is the Secretary of the U.S. Department of Commerce and is sued in her official capacity.  Secretary Raimondo directs all business of the Department of Commerce, including NOAA and its agency, NMFS.  Through these agencies, Secretary Raimondo is ultimately responsible for the approval of the Final Rule and is further responsible for the Department of Commerce's compliance with federal law, including NEPA, the MSA, and the APA.

17.     Defendant Janet Coit is the Assistant Administrator for NOAA Fisheries and is sued in her official capacity.  The U.S. Secretary of Commerce ("Secretary of Commerce" or "Secretary") has delegated responsibility to the NOAA Administrator to ensure compliance with NEPA, the MSA, and the APA, and to promote effective management and stewardship of the nation's fisheries resources and assets to ensure sustainable economic opportunities.  The NOAA Administrator, in turn, has subdelegated this responsibility to NMFS.

18.     Defendant Jon Kurland is the Administrator of the NMFS Alaska Region and is sued in his official capacity.

*United Cook Inlet Drift Association, et al. v. NMFS, et al.*
Case No. 3:24-cv-00154

7

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over this action pursuant to 5 U.S.C. §§ 701-706

(APA), 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 2201 (declaratory judgments),

28 U.S.C. § 2202 (injunctive relief), and 16 U.S.C. §§ 1855(f) and 1861(d) (MSA).

20.     Defendants have waived sovereign immunity in this action pursuant to

5 U.S.C. § 702 and 16 U.S.C. § 1855(f).

21.     Plaintiffs have exhausted all administrative remedies.

22.     Venue is properly vested in this Court under 28 U.S.C. § 1391 because

Plaintiffs' principal place of business is in this district, and a substantial part of the acts or

omissions giving rise to this controversy occurred in this district.

## STATUTORY FRAMEWORK

### The Magnuson-Stevens Fishery Conservation and Management Act

23.     The MSA is the primary domestic legislation governing management of

federal fisheries.  16 U.S.C. §§ 1801-1891d.

24.     The MSA created eight regional fishery management councils that are

primarily charged with preparing FMPs, plan amendments, and harvest specifications for

fisheries managed pursuant to FMPs for each managed federal fishery.  *Id.* § 1852(a)(1).

25.     The MSA requires an FMP for each fishery under the regional council's

jurisdiction "that requires conservation and management."  *Id.* § 1852(h)(1).  The FMP is

the foundational document for management of each fishery and provides the framework

for ensuring that fisheries are managed in a manner consistent with the requirements of the MSA and its 10 National Standards.

26. The MSA's purpose is to put these national fishery resources under "sound management" and "to realize the full potential of the Nation's fishery resources." *Id.* § 1801(a)(5)-(6). This includes both conservation measures to prevent overfishing, as well as a "national program for the development of fisheries which are underutilized or not utilized by the United States fishing industry." *Id.* § 1801(a)(7).

27. The MSA gives special attention to anadromous species such as salmon. Indeed, the MSA's stated purpose is "to take immediate action to conserve and manage the fishery resources found off the coasts of the United States, and the *anadromous species* . . . of the United States." *Id.* § 1801(b)(1) (emphasis added).

28. The Council manages fisheries that fall under its authority. Prior FMPs developed by the Council govern the management of salmon fisheries, including but not limited to the salmon fisheries in which Plaintiffs' members participate.

29. The authority of a state to manage fisheries in the exclusive economic zone ("EEZ"), beyond the state's territorial waters (three miles for purposes of MSA), is constrained by the MSA. The state may regulate all fishing activities in the adjacent portions of the EEZ only to the extent that the applicable FMP delegates such authority. *Id.* § 1856(a)(3). Absent such delegation through an FMP, the state may only regulate vessels registered under the laws of that state in the EEZ.

30.     Fishery management councils submit proposed FMPs and FMP amendments to the Secretary of Commerce for review and approval. *Id.* §§ 1853, 1854. All FMPs, and FMP amendments, must be consistent with the requirements of the MSA, including the 10 National Standards set forth in the MSA.

31.     The MSA's National Standards guide all FMPs and MSA regulations. For example, National Standard 1 requires FMPs to prevent overfishing while achieving the OY from each fishery for the U.S. fishing industry. *Id.* § 1851(a)(1). National Standard 2 requires that all conservation measures be based on the best scientific information available. *Id.* § 1851(a)(2). National Standard 3 provides that fisheries should be managed as a unit throughout their range, where practicable. *Id.* § 1851(a)(3). National Standard 4 requires that any allocation of fishing rights be "fair and equitable" to fishermen and "shall not discriminate between residents of different States." *Id.* § 1851(a)(4). National Standard 7 requires conservation measures to, where practicable, minimize costs and unnecessary duplication. *Id.* § 1851(a)(7). National Standard 8 requires conservation measures to take into account the importance of the fishery resources to fishing communities, to provide for the sustained participation of, and to minimize impacts on, such communities. *Id.* § 1851(a)(8). National Standard 10 requires conservation measures to promote the safety of human life at sea. *Id.* § 1851(a)(10).

32.     The Secretary of Commerce, acting through NMFS, must disapprove an FMP amendment and harvest specifications issued pursuant thereto to the extent inconsistent with provisions of the MSA or any other applicable law.

33.     The Secretary of Commerce must also approve all regulations that implement an FMP.  *Id*. § 1854(b).  The Secretary must give notice of proposed rulemaking and provide an opportunity for public comment on proposed regulations.  *Id*.

34.     Any fishery management regulation implementing an FMP must be consistent with the MSA, including the 10 National Standards for fishery management and conservation.  *Id*. §§ 1854(b), 1851(a). Any harvest specifications for managing fishing pursuant to an FMP must similarly be consistent with the MSA and its 10 National Standards. *See id.*

## The National Environmental Policy Act

35.     Approvals of FMPs, FMP amendments, their implementing regulations, and harvest specifications issued pursuant thereto are subject to NEPA requirements, 42 U.S.C. § 4321 *et seq*.; 16 U.S.C. § 1854(i).

36.     Congress established NEPA as "our basic national charter for protection of the environment."  40 C.F.R. § 1500.1(a) (1978) (amended July 16, 2020).  NEPA and its implementing regulations require that federal agencies, including NMFS, must prepare an environmental impact statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C); *see* 40 C.F.R. § 1501.3–.6 (2020).  The purpose of NEPA is to ensure that federal decision-making is fully and publicly informed through a reasonably thorough and thoughtful analysis of the probable environmental impacts resulting from a proposed federal action, and through identification and analysis of a reasonable range of alternative actions, including the no-

action alternative.  In enacting NEPA, Congress sought to ensure that federal agencies take a hard look at the environmental consequences of any proposed action and required agencies to comply with NEPA "to the fullest extent possible."  42 U.S.C. § 4332.

37.     NEPA requires that a federal agency proposing a major federal action with significant environmental effects prepare a detailed statement, which must include the environmental impacts of and alternatives to the proposed action.  *Id.* § 4332(2)(C)(i)-(iii).  This detailed written statement is an EIS.  *See* 40 C.F.R. § 1508.1(j) (2020).

38.     To determine whether an EIS is necessary, an agency may first prepare an EA.  *See id*. §§ 1501.5(a)–(c), 1508.1(h) (2020).  An EA is a "concise public document prepared by a Federal agency to aid an agency's compliance with the Act and support its determination of whether to prepare an [EIS] or a [FONSI]."  *Id*. § 1508.1(h) (2020).  An EA must contain sufficient information and analysis to determine whether the proposed action is likely to have significant impacts, thus requiring preparation of an EIS.  *See id*. §§ 1501.5(a)–(c), 1508.1(h) (2020).  An EA must consider a reasonable range of alternatives and must include a reasonably thorough discussion of the direct, indirect, and cumulative impacts of the proposed alternative.  *See* § 1501.5(c)(2) (2020).

39.     If an agency concludes, based on the EA, that an EIS is not required, it must prepare a FONSI, which explains the agency's reasons for its decision.  *Id*. §§ 1501.6(a)–(c), 1508.1(l) (2020).

40.     The analysis of alternatives should present the environmental impacts of the proposed action and the alternatives based on the information and analysis presented.

*Id*. § 1502.14 (2020).  The analysis must evaluate reasonable alternatives to the proposed action, identify a "no action" alternative, discuss in detail each alternative considered, and discuss the reasons alternatives were eliminated from the detailed study.  *Id*. § 1502.14(a)–(f) (2020).  These alternative analysis requirements also apply to EAs.  *See* 42 U.S.C. § 4332(2)(E); 40 C.F.R. § 1501.5(c)(2) (2020).

## The Administrative Procedure Act

41.    The APA provides for judicial review of final agency action by persons "aggrieved" by such action.  5 U.S.C. § 702.  The actions reviewable under the APA include any "preliminary, procedural, or intermediate agency action or ruling . . . on the review of the final agency action."  *Id*. § 704.

42.    The APA also provides standards applicable when a federal agency proposes and adopts final rules and regulations.  *Id*. §§ 553, 551(4).  Specifically, agencies must provide "[g]eneral notice" of any "proposed rule making" to the public through publication in the Federal Register.  That notice must include: "(1) a statement of the time, place, and nature of public rule making proceedings; (2) reference to the legal authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved."  *Id*. § 553(b).  An agency's responsibility to consider public comments on a proposed rulemaking is required by 5 U.S.C. § 553(c).

43.    Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A). A reviewing court shall also "hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law." *Id.* § 706(2)(D).

## STATEMENT OF FACTS

### The Cook Inlet Salmon Fishery

44.     Upper Cook Inlet is home to five species of anadromous salmon—chinook, sockeye, coho, pink, and chum—as well as steelhead trout. These are some of the largest natural, wild returns of salmon in the nation. And unlike many of our nation's fisheries that are fully utilized (or even overutilized), Cook Inlet salmon stocks are largely underutilized. For example, in 2014, an estimated 20 million pink salmon returned to Cook Inlet, but state restrictions limited harvest to 642,754 fish, with *15 million pink salmon not utilized* and not needed for biological purposes. This happened again in 2020.

45.     The Kenai River sockeye runs in Cook Inlet, in particular, are world-class, with the potential to produce millions of adult sockeye annually. These sockeye are also genetically unique, with an unusual variety in the age and large size of adult returning stocks.

46.     The commercial fishery on these Cook Inlet anadromous stocks dates back to at least 1882, utilizing all manner of gear types, from fishwheels to driftnets. The federal government expressly recognized the national importance of maintaining this commercial fishery in 1952 when it negotiated by treaty to exclude Cook Inlet from an international treaty banning most net fishing activities outside of state waters.

47.     Commercial fishing in Upper Cook Inlet is currently limited to two gear types (set and drift gillnets) and occurs on all five Cook Inlet anadromous salmon stocks. When they are permitted to fish, eastside set net operations deploy gillnets from fixed locations near shore, anchored to the bottom, and commonly extending in sections as far as one and a half miles offshore. Westside set net operations are commonly extended up to five miles off shore. Northern District set net operations commonly extend up to 10 miles off the northern inlet shores. Drift gillnets, by contrast, are deployed from small vessels.

48.     The majority of commercial fishing harvest in Upper Cook Inlet is sockeye. The majority of the commercially caught Cook Inlet salmon find their way to grocery stores and restaurants in the United States. Cook Inlet salmon are an important and healthy part of the nation's food supply.

49.     The Cook Inlet salmon fishery is highly competitive and requires conservation and management.

**The 1990 Salmon FMP**

50.     The last major revision to the Salmon FMP was in 1990. The 1990 Salmon FMP has two management areas: the East Area and the West Area. The border between the two areas is the longitude of Cape Suckling.

51.     The 1990 Salmon FMP addressed commercial salmon fishing in the East and West Areas differently. In the East Area (which consists primarily of coastal waters off southeast Alaska), the 1990 FMP set forth the Council's management goals and

objectives. The 1990 FMP delegated management of East Area fisheries, consistent with the Council's management goals and objectives, to the State of Alaska.

52.     In the West Area, by contrast, the 1990 Salmon FMP provided little guidance on how to manage salmon. Instead, the 1990 Salmon FMP closed the vast majority of the West Area to commercial fishing, consistent with prohibitions in the International Convention for the High Seas Fishery of the North Pacific Ocean ("High Seas Convention"). Also consistent with the High Seas Convention, the 1990 FMP exempted from this closure three historic net fisheries: Cook Inlet, Prince William Sound, and the Alaska Peninsula area. The EEZ portion of Cook Inlet open to fishing is a contiguous area of approximately 1,100 square miles. The 1990 Salmon FMP did not expressly delegate management to the State of Alaska or set clear management goals or objectives for the West Area.

53.     The High Seas Convention was repealed and replaced in 1992 by the North Pacific Anadromous Stock Act of 1992, which contained no provisions for management of the three historic net fisheries areas. Despite the change in the law, the Council took no action for nearly 20 years to make changes to the FMP to clarify for the West Area how it was to be managed.

### The State of Alaska's Management of the Cook Inlet Salmon Fishery

54.     The State of Alaska has managed the salmon fisheries in Alaska since 1960. As a condition of statehood, Alaska was allowed to manage the Cook Inlet salmon fishery provided that "the Alaska State Legislature has made adequate provision for the

administration, management, and conservation of said resources in the broad *national interest*." Alaska Statehood Act, Pub. L. No. 85-508 § 6(e), 72 Stat. 339, 341 (1958) (emphasis added). The State of Alaska sets its fishery management policies through the Alaska State Board of Fish and implements those management policies through the Alaska Department of Fish and Game.

55. The State of Alaska manages salmon in Cook Inlet based on a series of state management plans without federal oversight. Generally speaking, these management plans set escapement goals for salmon. An escapement goal, in this context, is the number of salmon that the state has determined is necessary or desirable to "escape" past fishing sectors and, thereby, provides spawning stock for successive generations or meets other needs.

56. The state management plans also include allocation decisions. Allocation decisions are generally made by setting the number of fishing days, including time and area, allowed for a particular gear type during the season.

57. In season, the state manages these fisheries based on assessments of run strength, as measured against desired escapement goals. In theory, if the run strength is estimated to be larger than normal, then more fishing days are authorized to avoid exceeding maximum escapement targets. If run strengths are estimated to be smaller than normal, then fewer fishing days are authorized to avoid dropping below minimum escapement targets. These run strength assessments are based on preseason forecasts, test boat data, and other factors.

*United Cook Inlet Drift Association, et al. v. NMFS, et al.*
Case No. 3:24-cv-00154
17
123795381.1 0014655-00005
Case 3:24-cv-00154-HRH    Document 1    Filed 07/16/24    Page 17 of 35

58.     Setting science-based escapement goals for salmon is essential to a well-managed fishery.  If an escapement goal is set too low, then the fishery gets overfished and run strengths diminish over time.  If an escapement goal is set too high, then the harvestable surplus is lost.  Where too many salmon escape and spawn, the fitness of that run may also be diminished in future years due to density-dependent effects and other biological and ecological factors.  That is especially the case for sockeye, where rearing space and food supply in the lakes and rivers are a limiting factor.  Over-escapement events can reduce run strengths for two or three successive years.

59.     The state has two basic kinds of escapement goals: biological and sustainable.  Biological escapement goals are intended to achieve the MSY (human consumption for that fishery as a food resource).  Sustainable escapement goals, by contrast, are based on historical data showing that a certain harvest level can be sustained. In Upper Cook Inlet, only one salmon stock has a biological escapement goal.  This goal has not been peer reviewed or set for MSY as required by MSA and National Standard 1.

60.     Beginning in 2000, the state imposed a "Sustainable Salmon Fisheries Policy" ("SSFP") intended to ensure the long-term viability of salmon runs in Alaska.

61.     The state has affirmatively stated that it is under no obligation to comply with the MSA in making its fishery management decisions, and it has said it "would not accept a delegation of management authority for the Cook Inlet EEZ salmon fishery under the conditions that would be necessary to comply with the MSA," i.e., that it will not manage fishing in state waters consistent with the MSA.  Indeed, the state's record

*United Cook Inlet Drift Association, et al. v. NMFS, et al.*
Case No. 3:24-cv-00154
18
123795381.1 0014655-00005
Case 3:24-cv-00154-HRH   Document 1   Filed 07/16/24   Page 18 of 35

has shown that it has not managed fishing, especially the fishing in Cook Inlet, in a manner consistent with the MSA.

62.     In 1990, when the last Salmon FMP was created, the state typically managed the salmon fishing sectors in accordance with the MSA.  Beginning in 1996, the state began departing from MSA management.  And, when the state subsequently adopted the SSFP, it no longer made any attempt to manage fishing in Cook Inlet under MSA standards.

63.     The Cook Inlet salmon fishery was historically one of the nation's most productive salmon fisheries.  In the 1980s and 1990s, the sockeye salmon harvest alone ranged consistently from four to nine million sockeye per year.  During the last two decades, the commercial harvest in Cook Inlet has steadily—and more recently, precipitously—declined.  The 10-year average annual commercial sockeye catch for 2014–2023—based on the preliminary data released by the State of Alaska, Department of Fish and Game for 2023—was just 1.65 million sockeye.  A significant portion of this reduction in catch has been converted by the state's management to over-escapement (surplus to optimum yield "OY") into the Upper Cook Inlet river systems.  For example, just in 2023, the total sockeye harvest (1.6 million sockeye) was approximately equal to or less than the over-escapement in just two rivers—the Kenai and Kasilof Rivers— which were overescaped by 1.65 million sockeye.  If the commercial fleet had been permitted to catch this over-escapement, their total catch for the season would have been over 3 million sockeye, below the low end of the historical average but a significant

*United Cook Inlet Drift Association, et al. v. NMFS, et al.*
Case No. 3:24-cv-00154
19
123795381.1 0014655-00005
Case 3:24-cv-00154-HRH   Document 1   Filed 07/16/24   Page 19 of 35

improvement over the status quo.  Instead, these fish were wasted due to the state's failure to manage in accordance with the upper bound of its escapement goals, which resulted in lost yield in 2023 and jeopardized yield in future years.

64.     Accompanying the last two decades of historically low salmon harvest is the state's decision to gradually restrict the commercial fishery year after year, with most openings now being severely geographically limited to only a narrow band, preventing the fishery from targeting areas where salmon congregate.  At the same time, the state has continued to increase "escapement" levels to record high (and likely unsustainable) levels in order to guarantee more than enough fish for the sport fishers to catch and to stock the state resident-only personal use fishery with hundreds of thousands of fish.[1]  Even with inflated escapement targets, the restrictions on commercial fishing are so significant that the state still regularly exceeds those escapement goals by a wide margin.

65.     The state restrictions have resulted in severe financial hardship to the U.S. citizens participating in the Cook Inlet commercial salmon fishery, as well as the businesses that rely on the commercial harvest.  Twenty years ago, Cook Inlet had 23 major salmon processors willing to purchase and prepare salmon for the wholesale and retail markets, including both international markets and local food stores throughout the U.S.  Presently, there are only two major salmon processors left in Cook Inlet.

---

[1] For example, the in-river escapement goal for sockeye in the 1980s and early 1990s (when the fishery was doing very well) was 400,000 to 700,000.  By 2011, the state ratcheted that goal to 1.1 million to 1.35 million, with no underlying biological basis for the change.

*United Cook Inlet Drift Association, et al. v. NMFS, et al.*
Case No. 3:24-cv-00154

123795381.1 0014655-00005

66.     Importantly, these state restrictions are based not on science or sound principles of species conservation and fishery management, but rather on other "allocative purposes," like "mak[ing] sport fisheries more enjoyable." In fact, as a result of the state's over-escapement approach, the increasing *sport* fishery (and the resident-only personal use fishery) has harmed Cook Inlet salmon by causing "serious in-river habitat degradation problems such as hydrocarbon pollution and turbidity levels that exceed clean water standards, and miles of trampled riverbanks." Millions of salmon go unharvested every year while the commercial fleet is sidelined, to the detriment of Plaintiffs' members, local fishing communities, and the national interest in this important food source as expressed by the Magnuson-Stevens Act.

67.     As noted above, only one salmon stock in Cook Inlet is claimed to have a biologically based escapement goal. Many runs in Cook Inlet have no escapement goal of any kind. There are no escapement goals for pink salmon, only one tributary with escapement goals for chum, and two tributaries with escapement goals for coho. Of the 35 chinook tributaries, only seven have any escapement goals or monitoring data, and most of those seven are listed under the state designation of "stock of concern."

68.     State management in Cook Inlet has destabilized the fishery. As a result, many seafood processors have simply quit doing business in Cook Inlet, citing a hostile business environment created by state mismanagement as the reason. Harvests of some stocks have declined as much as 50% due to state management. Every year, millions of salmon (worth tens of millions of dollars to local and national communities and

businesses), above and beyond those necessary to meet biological needs, go unharvested due to state mismanagement.

## History of This Litigation

69.     In 2010, Plaintiffs sought to turn the tide of state mismanagement of the fishery by appealing to NMFS and the Council, and asking for the development of an FMP to manage the Cook Inlet salmon fishery in a manner consistent with the National Standards of the MSA.  NMFS and the Council flatly refused, claiming that they (as the entities entrusted by Congress to manage the nation's fishery resources) lacked the expertise to manage salmon in Alaska (even though they, in fact, manage salmon in other areas of Alaska).  Instead, in 2012, NMFS and the Council issued Amendment 12 to the Fishery Management Plan for Salmon Fisheries in the EEZ off the Coast of Alaska (the "Salmon FMP").  *See* 77 Fed. Reg. 75,570 (Dec. 21, 2012).  Amendment 12 cut the Cook Inlet salmon fishery out of the Salmon FMP altogether and deferred all management authority to the State of Alaska.

70.     Plaintiffs initiated this litigation more than a decade ago against Federal Defendants (collectively "NMFS") to challenge Amendment 12.  The Ninth Circuit Court of Appeals agreed with Plaintiffs that NMFS' decision to defer management to the State of Alaska in Amendment 12 was illegal.  *United Cook Inlet Drift Ass'n v. Nat'l Marine Fisheries Serv. (UCIDA I)*, 837 F.3d 1055, 1063 (9th Cir. 2016).  The Ninth Circuit instructed that NMFS could not "wriggle out of" its duties or "shirk" the statutory command to produce an FMP for the Cook Inlet salmon fishery.  *Id*. at 1063, 1064.

Moreover, the Ninth Circuit rejected NMFS's argument that the Magnuson-Stevens Act "does not expressly require an FMP to cover an entire fishery." *Id*. at 1064. Furthermore, the "Act makes plain that federal fisheries are to be governed by federal rules in the national interest, not managed by a state based on parochial concerns." *Id*. at 1063.

71.     The Ninth Circuit's decision in September of 2016 initiated a five-year administrative process that NMFS, the Council, and the State of Alaska turned into a complete farce.  At the last minute, the Council completely abandoned its efforts to create a federally delegated or a federally managed FMP program for the Cook Inlet salmon fishery.  Instead, at the urging of the State of Alaska (and with help from NMFS), the Council proposed an amendment ("Amendment 14") to close commercial salmon fishing in federal waters altogether, and relinquish and defer all management decision for the Cook Inlet salmon fishery to the State of Alaska.  This was precisely the opposite of what the Ninth Circuit instructed.  NMFS issued final regulations implementing Amendment 14 on November 3, 2021.  *See* 86 Fed. Reg. 60,568 (Nov. 3, 2021). Amendment 14 determined that "'[t]he Cook Inlet salmon fishery includes the stocks of salmon harvested by *all* sectors within State and federal waters of Cook Inlet,'" 2021 Case, Dkt. 67 at 20 (quoting record), and that OY "for the Cook Inlet salmon fishery is set to the 'level of catch from all salmon fisheries occurring within Cook Inlet (State and Federal water catch) . . . .'" *Id.* at 23 (quoting record).  In other words, Amendment 14 set OY as whatever the state has allowed under state management.

72.     UCIDA challenged Amendment 14, and on June 21, 2022, this Court granted UCIDA's motion for summary judgment, vacating the final rule.  *See* 2021 Case, Dkt. 67. This Court explained that Amendment 14 effectuated another unlawful deferral to the state as it made "federal management standards in form rather than substance," violating the instructions in *UCIDA I.  See id.* at 22–23.  The Court also explained that OY based on state harvest levels violated National Standard 1—the obligation to set the "optimum yield from each fishery" and to do so on "'the basis of maximum sustainable yield ["MSY"] from the fishery.'" *Id*. at 26–27 (quoting 16 U.S.C. § 1802(33)). As the Court explained, "[b]ootstrapping statutorily required management measures, such as MSY and OY, to the actual number of fish caught in the Cook Inlet, as determined by the State of Alaska, summarily casts the decision of what constitutes 'the amount of fish which . . . will provide the greatest overall benefit to the Nation' to the Alaska Department of Fish and Game.'" 2021 Case, Dkt. 67 at 29 (quoting 16 U.S.C. § 1851(a)(1)).

73.     As a result of these (and many other) violations, the Court issued a remedy order on November 28, 2022, directing that NMFS "shall issue regulations implementing a new FMP amendment that is consistent with the Court's [SMJ] Order and the previous orders in this litigation and complies with the [MSA], the APA, and all other applicable laws by no later than May 1, 2024."  2021 Case, Dkt. 103 at 10.  The Court also required NMFS to file periodic status reports every 45 days, set a status conference in April 2023, and retained jurisdiction over the case.  *See* 2021 Case, Dkt. 77 at 10–11.

*United Cook Inlet Drift Association, et al. v. NMFS, et al.*
Case No. 3:24-cv-00154
24
123795381.1 0014655-00005
Case 3:24-cv-00154-HRH   Document 1   Filed 07/16/24   Page 24 of 35

74.     In its third status report filed on April 13, 2023, NMFS explained that the

Council "was scheduled to take final action to recommend an FMP amendment at its

April 2023 meeting." 2021 Case, Dkt. 98-1 at 1. "The Council had two viable

alternatives to choose from: federal management of the fishery in the EEZ with specific

management measures delegated to the State of Alaska (State) through the FMP

(Alternative 2), or direct federal management of the fishery in the EEZ (Alternative 3)."

*Id.* NMFS explained that "the State informed NMFS and the Council during the Council

meeting that it would not accept a delegation of management authority for the Cook Inlet

EEZ salmon fishery under the conditions that would be necessary to comply with the

MSA." *Id.* at 2. NMFS explained that this left the Council with one viable management

alterative: adopting a federal management regime. *Id.* at 2. "NMFS proffered a motion

that would have adopted Alternative 3, but no member of the Council would second that

motion." *Id.* NMFS explained that "[w]ith no other viable choice, [it] informed the

Council that [it] would immediately begin work on a Secretarial amendment that would

likely resemble Alternative 3." *Id.* NMFS explained that "[b]ecause the analysis needed

to support Secretarial action mirrors the analysis NMFS completed for the Council, it is

largely complete." *Id.* at 3. NMFS stated that it "has not identified any legally viable

management alternatives that were not presented to the Council, and NMFS is still on

track to implement a final rule by May 2024." *Id.* at 3.

75.     In its response to NMFS's third status report, UCIDA explained its

concerns with NMFS's use of the Secretarial Amendment process to "forge ahead with

its failed proposed Council amendment," and UCIDA proposed several potential off ramps.  *See* 2021 Case, Dkt. 100 at 3–5.

76.      On May 2023, the Court issued an amended remedy order explaining that "the actions taken by the Federal Defendants in the eleven months following the Court's [SMJ Order] are nearly identical to those taken to implement the now-vacated Amendment 14."  2021 Case, Dkt. 103 at 9.  "Given the history of this litigation and the progress of remand thus far, . . . stronger judicial intervention is necessary to ensure that the same processes do not yield the same result."  *Id.*  Accordingly, the Court ordered the parties to collaborate in order to avoid a perpetual cycle of litigation.  *See id.*

77.      The parties had two collaboration meetings in May 2023 (*see* 2021 Case, Dkt. 102 at 2) and filed a joint status report regarding the meetings (*see* 2021 Case, Dkt. 104).  UCIDA explained its belief that "the parties are still very far apart on what constitutes a legal and effective FMP for the Cook Inlet salmon fishery."  2021 Case, Dkt. 104 at 7.  This notwithstanding, NMFS continued the process of developing Alternative 3.  *See* 2021 Case, Dkts. 106–08, 110–12, and 118.

78.      On December 20, 2023, the Court held a status conference.  *See* 2021 Case, Dkt. 119.  UCIDA alerted the Court to its concern that the remand process was heading for a trainwreck in May 2024.  *See* 2021 Case, Dkt. 121-1 at 2.  UCIDA explained that continued litigation and non-compliance with the Magnuson-Stevens Act by NMFS was an unacceptable outcome.  *See* 2021 Case, Dkt. 121-1 at 2.

*United Cook Inlet Drift Association, et al. v. NMFS, et al.*
Case No. 3:24-cv-00154
26
123795381.1 0014655-00005
Case 3:24-cv-00154-HRH   Document 1   Filed 07/16/24   Page 26 of 35

79. On April 30, NMFS published the final rule implementing Amendment 16. 89 Fed. Reg. 34718, 34719. The next day, NMFS filed a Notice of Completion of Remand. *See* 2021 Case, Dkt. 132 at 2.

80. With Amendment 16, NMFS once again found a new and clever way to try and continue to defer to the state's historic management practices, even as commercial harvests continue to dwindle.

81. Amendment 16 indicated that NMFS would issue harvest specifications for the 2024 season through a separate action. On April 12, 2024, NMFS issued a proposed rule that proposed 2024 harvest specifications for the salmon fishery "of the Cook Inlet exclusive economic zone (EEZ) Area." 89 Fed. Reg. 25857, 25957. It explained "[t]his action is necessary to establish harvest limits for salmon during the 2024 fishing year and to accomplish the goals and objectives of the [FMP]." *Id.*

82. In the proposed rule, NMFS explained that it "compiled and presented the preliminary draft 2024 SAFE report for the Cook Inlet EEZ Area salmon stocks and stock complexes, dated February 2024 [] at the February North Pacific Fishery Management Council (Council) meeting." *Id.* at 25858. NMFS explained that "[t]he SSC made recommendations regarding OFLs and ABCs and the AP recommended TACs, but after NMFS's consultation with the Council, the Council took no action to recommend Cook Inlet EEZ Area salmon harvest specifications." *Id.* at 25859. "NMFS is therefore proposing the OFL and ABC recommended by the SSC and TACs consistent with the SSC's fishing level recommendations and that account for the significant management

uncertainty associated with this new fishery." *Id.* NMFS proposed a total allowable catch ("TAC") of 492,100 sockeye salmon, 240 Chinook salmon, 25,000 coho salmon, 99,400 chum salmon, and 121,700 pink salmon, for a total TAC of 738,440. *Id.*

83.     On June 18, 2024, NMFS published the Final Rule implementing the harvest specifications for 2024 (the "Harvest Specifications"). *See* 89 Fed. Reg. 51448, 51448–459.

## FIRST CLAIM FOR RELIEF

### (Failure to Comply with Prior Court Orders)

84.     Plaintiffs incorporate by reference all preceding paragraphs of this Complaint.

85.     Plaintiffs have not yet received the relief they are entitled to under their original complaint, the holding of the Ninth Circuit, and the holding of this Court in its order vacating Amendment 14.

86.     MSA Section 304(a) and (b), 16 U.S.C. § 1854(a)-(b), requires Defendants to ensure FMPs, their implementing regulations, and harvest specifications issued pursuant thereto are consistent with the requirements of the MSA.

87.     The Final Rule and its Harvest Specifications continue to defer management to the State of Alaska without delegation through an FMP, including but not limited to by failing to achieve optimum yield for the fishery.  This is directly contrary to the applicable court orders.

88.     By continuing to refuse to comply with the MSA as held by the Ninth Circuit and this Court, NMFS has both prejudiced and injured Plaintiffs' rights and interests, and Plaintiffs have no other adequate remedy at law.  For these reasons, Plaintiffs are entitled to the relief requested below.

## SECOND CLAIM FOR RELIEF

### (Violation of the MSA and the APA—Harvest Specifications)

89.     Plaintiffs incorporate by reference all preceding paragraphs of this Complaint.

90.     The MSA allows judicial review pursuant to the APA, 5 U.S.C. § 706(2)(A), (B), (C), or (D). 16 U.S.C. § 1855(f)(1)(B).  Those provisions of the APA authorize reviewing courts to set aside federal agency action that is arbitrary, capricious, and an abuse of discretion, in excess of statutory limitations, or without observance of the procedures required by law.

91.     In addition to and including all the reasons set forth above, the Final Rule and its Harvest Specifications violate the MSA, and should be set aside under the APA for multiple reasons.  A non-exhaustive list is included below:[2]

a.     The Final Rule and its Harvest Specifications fail to comply with the MSA's statutory requirement to provide fisheries and management measures for

---

[2] Plaintiffs filed detailed comments on proposed rule and its Harvest Specifications detailing their legal flaws.  Those comments are attached to this Complaint and incorporated herein.

*United Cook Inlet Drift Association, et al. v. NMFS, et al.*
Case No. 3:24-cv-00154

29

each entire fishery under its jurisdiction that requires conservation and management. "Fishery" is a defined term that dictates the scope of an FMP and its management measures. NMFS has improperly bifurcated the Cook Inlet salmon fishery into artificial state and federal components based on a purely jurisdictional justification, and it fails to provide an FMP that covers fishing in state waters or that establishes harvest specifications for the entire fishery.

b.      NMFS's use of a TAC and its chosen TAC through its Harvest Specifications do not ensure that optimum yield is achieved for the Cook Inlet salmon fishery in violation of National Standard 1. In its SAFE, NMFS fails to mention optimum yield even once. Rather, NMFS uses the term "potential yield," although its management measures do not contemplate harvest of this "potential yield." NMFS's SAFE clearly demonstrates the wasted yield that could be harvested, but the chosen TAC has no connection to actually achieving optimum yield. This violates National Standard 1.

c.      NMFS's use of a TAC in its Final Rule and its chosen Harvest Specifications are not supported by the best scientific information in violation of National Standard 2. NMFS has repeatedly confirmed that the use of a TAC is not the best approach, and therefore it cannot be based on the best scientific information available. The specific limits set for each species of salmon are not supported by the best scientific information. Specifically, the margin for sockeye

*United Cook Inlet Drift Association, et al. v. NMFS, et al.*
Case No. 3:24-cv-00154
30
123795381.1 0014655-00005
Case 3:24-cv-00154-HRH   Document 1   Filed 07/16/24   Page 30 of 35

(a plentiful stock with very low to zero risk of over-harvest) is significantly more restrictive than the margins for other less plentiful species.

d.       NMFS's Final Rule and Harvest Specifications also violate National Standard 3. NMFS fails to manage the Upper Cook Inlet salmon stocks as a unit throughout their range by setting a TAC and Harvest Specifications for only the Cook Inlet EEZ area when the remainder of the Cook Inlet salmon fishery is managed based on escapement goals (notwithstanding that the State of Alaska routinely exceeds its escapement goals and notwithstanding that the state has failed to establish escapement goals for many stocks).

e.       The Final Rule and the Harvest Specifications also violate National Standard 4 by allocating fishing privileges among Cook Inlet salmon fishermen but without doing so in a manner that is fair and equitable to all fishermen. By severely limiting federal waters harvest, NMFS allocates the privilege to harvest to state-waters fishing sectors. A prerequisite to an allocation of this type is a finding that it is fair and equitable. NMFS has made no such finding.

f.       The Final Rule and the Harvest Specifications also violate National Standard 5 by failing to promote efficiency in the utilization of fishery resources in violation of National Standard 5. If NMFS implemented escapement-based management, rather than a TAC and restrictive Harvest Specifications, then NMFS's justification for prohibiting vessels from fishing in state and federal waters in the same trip—which creates significant inefficiency and operational

*United Cook Inlet Drift Association, et al. v. NMFS, et al.*
Case No. 3:24-cv-00154
31
123795381.1 0014655-00005
Case 3:24-cv-00154-HRH    Document 1    Filed 07/16/24    Page 31 of 35

confusion—would disappear. It would also be unnecessary to impose the economic burden on fishery participants of obtaining VMS (this is also a reason that NMFS's use of a TAC violates National Standard 7).

g.      NMFS's use of a TAC, its Final Rule, and its chose Harvest Specifications also violate National Standard 8 by failing to consider the importance of fishery resources to fishing communities and by failing to utilize economic and social data in order to provide for the sustained participation of such communities or to minimize adverse economic impacts on such communities.

92.     The Final Rule and the Harvest Specifications are arbitrary, capricious, and contrary to the MSA, and NMFS's approval of the Final Rule and the Harvest Specifications has prejudiced and injured Plaintiffs' rights and interests, and Plaintiffs have no other adequate remedy at law. For these reasons, Plaintiffs are entitled to the relief requested below.

## THIRD CLAIM FOR RELIEF

### (Violation of NEPA and the APA)

93.     Plaintiffs incorporate by reference all preceding paragraphs of this Complaint.

94.     NEPA requires that federal agencies prepare a "detailed statement" regarding all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  NEPA requires an agency to take a hard look at the environmental consequences of a proposed action, including by disclosing and

analyzing the significance of all direct, indirect, and cumulative environmental impacts of each alternative. 40 C.F.R. §§ 1502.14, 1502.16 (2020). The agency's analysis must include accurate scientific analysis, expert agency comments, and public scrutiny. *Id.* §§ 1502.23, 1501.5 (2020); 40 C.F.R. § 1500.1(b) (1978) (amended July 16, 2020).

95. If there exist substantial questions whether the action may have a significant effect on the environment, the agency must prepare an EIS.

96. If an agency decides not to prepare an EIS for a major federal action, it must supply a convincing statement of reasons to justify its conclusion that a project will not have significant impacts on the environment. *Id.* §§ 1508.1(l), 1501.6 (2020).

97. NMFS failed to produce a convincing statement of reasons demonstrating that Final Rule and the Harvest Specifications will not have significant impacts on the environment. NMFS has not taken a hard look at the environmental and conservation impacts that will occur to Cook Inlet salmon stocks as a result of managing via a TAC with highly restrictive Harvest Specifications in the EEZ. Likewise, NMFS failed to take a hard look at the socioeconomic consequences of separately managing the EEZ portion of the fishery under a highly restrictive TAC and highly restrictive Harvest Specifications. The state has a demonstrated pattern of commercial fishery disasters in Cook Inlet over the last decade, and the Final Rule and its Harvest Specifications essentially ensures another disaster.

*United Cook Inlet Drift Association, et al. v. NMFS, et al.*
Case No. 3:24-cv-00154
33
123795381.1 0014655-00005
Case 3:24-cv-00154-HRH    Document 1    Filed 07/16/24    Page 33 of 35

98.     NEPA requires an agency to develop and assess appropriate alternatives in any proposal involving unresolved conflicts concerning uses of available resources. 42 U.S.C. § 4332(2)(E); 40 C.F.R. §§ 1507.2(d), 1501.5(c)(2) (2020).

99.     The EA fails to consider a reasonable range of alternatives.  It fails to meaningfully consider reasonable management alternatives to using a TAC, like escapement-based management, even though stakeholders are essentially unanimous that a TAC is not an effective management measure for a salmon fishery.  NMFS is not so constrained that it is excused from its failure to consider viable and effective alternatives, rather than settling on an alternative that it admits is ineffective.

100.    NMFS's decision to approve Final Rule and Harvest Specifications without considering appropriate alternatives and comparing the environmental impacts of those alternatives was arbitrary, capricious, and not in accordance with law and violated NEPA, 42 U.S.C. § 4332(2)(C), its implementing regulations, 40 C.F.R. §§ 1502.14(a), 1507.2(d), 1501.5(c)(2) (2020), and the APA, 5 U.S.C. §§ 702, 706.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

A.      Declare that the Defendants violated the MSA, APA, and NEPA;

B.      Declare that the Defendants' actions, as set forth above, were arbitrary and capricious, an abuse of discretion, not in accordance with law, and without observance of procedure required by law;

C.   Declare that the Final Rule and Harvest Specifications are not consistent with the Ninth Circuit's or this Court's decisions in this matter;

E.   Vacate the Final Rule and its Harvest Specifications and remand with an order instructing the Defendants to develop Harvest Specifications pursuant to an FMP for the *entire* Cook Inlet salmon fishery that complies with the requirements of the MSA, APA, and NEPA, and the Ninth Circuit's and this Court's holdings;

F.   Vacate the FONSI, and remand with an order instructing, as appropriate, the Defendants to prepare an EA or EIS that complies with NEPA and the APA;

G.   Award Plaintiffs their reasonable attorney fees, costs, expenses, and disbursements, including attorney fees associated with this litigation pursuant to the Equal Access to Justice Act or other law; and

H.   Award Plaintiffs other and further relief as this Court may deem just and equitable.

DATED this 16th day of July 2024.

STOEL RIVES, LLP

*/s/ Connor R. Smith*
Ryan P. Steen, AK Bar No. 0912084
Jason T. Morgan, AK Bar No. 1602010
Connor R. Smith, AK Bar No. 1905046

*Attorneys for Plaintiffs United Cook Inlet*
*Drift Association and Cook Inlet Fishermen's*
*Fund*